MILO S. MILLS, Appellant, v. JANE T. McCAUSTLAND, CHARLES McCAUSTLAND AND FRANK P. MILLS.

**Specific Performance.** EVIDENCE. *Land Contract.* Plaintiff worked for his stepfather seven years after his mother's death, and then was given possession of the land in controversy, which he held until his stepfather died, five years later. Defendant married the stepfather two years after the death of plaintiff's mother, and she testified that, just prior to the marriage, plaintiff told her the land belonged to his stepfather, but plaintiff denied this. Numerous witnesses testified that the stepfather had declared that he had agreed to give the land to plaintiff for his services, and that he did not execute deed, because defendant refused to sign it. *Held,* that plaintiff was entitled to specific performance of an oral contract to convey land.

**Contracts:** CONSTRUCTION BY PARTIES: *Performance.* When dece-dent's youngest child was four years old he agreed to convey land to plaintiff if he would assist in caring for decedent's children until they could look after themselves. Plaintiff rendered such

assistance for seven years, when decedent said that plaintiff had earned the land, and gave him possession thereof. *Held*, that decedent being satisfied, his widow could not claim that plaintiff had not complied with the contract.

**Devise:** PARTIAL RENUNCIATION: *Election.* A stepfather agreed, upon consideration, to convey certain lands to his stepson and devised that land and other to him, by will. *Held*, the stepson, could, without being put to an election, claim the land conveyed by contract and also willed, under the contract, and claim the other land under the will. Such a course is not inconsistent, and, therefore no election is necessary.

*Appeal from Plymouth District Court.*—HON. F. R. GAYNOR, Judge.

SATURDAY, APRIL 9, 1898.

ACTION to establish title and for specific performance of an oral contract to convey land alleged to have been made with D. M. Mills in his lifetime. This relief was denied, and, as prayed in her cross-petition, the distributive share ordered set apart to Jane T., the widow of D. M. Mills, intermarried since with Charles McCaustland. Plaintiff appeals.—*Reversed.*

*Ira T. Martin* for appellant.

*I. S. Struble* and *Dale Hunter* for appellees.

LADD, J.—On the twenty-sixth day of April, 1893, D. M. Mills, died testate, owning about 1,000 acres of land in Plymouth county. His will was admitted to probate May 25th of the same year, and under its terms, the north one-half of the southwest one-fourth of section 13, the north one-half of the southeast one-fourth and lots 1 and 2 of section 14, and lot 6 in section 15, all in township 92 north, of range 49 west of fifth principal meridian, being the land in controversy, and certain other property, was devised to this plaintiff. Provisions for Frank P. Mills and the widow were also

made, but the latter concluded to take her distributive share in the estate. Frank P. Mills is the only heir of the deceased, and made no defense to the action. The plaintiff is his stepson, and half-brother to Frank. Charles McCaustland married the widow, Jane T. Mills, and is interested only as her husband. She married Mills in July, 1883, and is a sister of his first wife, who died in March, 1881, leaving three sons, besides Milo and a daughter. This daughter died in 1885, and her sons George in 1890 and David in 1891. Plaintiff bases his claim to this land on an alleged oral agreement with his stepfather, made soon after his mother's death, to the effect that, if plaintiff would continue to live in his family, as he had been doing, for about five years, and work for Mills, and assist in raising the children until they were of sufficient age to look after themselves, he would deed plaintiff the land, erect a house and building thereon, and supply him with a team and farming tools sufficient to work it. He alleges that in pursuance of this contract he worked for the deceased until about the year 1888, performed all required of him, and fully complied with the terms of the contract, and the deceased gave him a team, two cows, erected a dwelling house as he agreed, and gave him possession of the land.

I.    The first question to be determined is whether there was an oral contract, as alleged. The evidence shows without controversy that the deceased was much attached to the plaintiff, who had assisted him on his farm and proven faithful to all his interests. He loved him as his own son. Milo was twenty-two years of age at the time of his mother's death, and was under no legal obligation to assist his stepfather in the operation of the farm or in the care of his children. As early as 1878, Mills and his wife stated to several witnesses that the farm in controversy belonged

to Milo, and that it was their intention that he should have it. James Marshall is the only witness who testifies to having heard a conversation between the deceased and plaintiff. While working at the stable, he was called to the house by Mills, and requested to listen to an offer he was about to make. The deceased then said: "I am going to give him that piece of land down there. I am going to break some of it, and give him a team, and put up a house on it. Don't you think he will have a good start?" And stated, further, that he had agreed to give Milo the land if he stayed at home and helped take care of the children. In response to this, Milo said he would stay with the family. The time fixed was until the children were big enough to care for themselves. To Marshall he frequently referred to the land in controversy as Milo's farm. Frank P. Mills testified that the deceased said to David and himself: "Milo is to stay with you boys until you are grown up, and I am going to give him the farm and set him out;" that the farm referred to was that in controversy; that he always spoke of this land as Milo's farm; that he afterwards told Milo to pick out any team he wished, and he would give him two cows, and meant to give him this place and property to stay at home and work until the boys were grown up. After Milo had moved on the premises, the deceased said to Frank he always meant it to be Milo's farm. It was his land, and he had well earned it, and added: "There is plenty left for you boys." To his intimate friend Wheeler, he spoke of Milo with affection, and said: "I am building a house now. He has been a good boy. I am going to let him take his choice of my horses, give him a bunch of cattle, and let him go it for himself, and I will help him in any way that I can." To this witness he always referred to the land as Milo's, and often told him Milo was to stay at home until the little ones had grown up, and that he

was going to give him the land and the property referred to for what he had done and for what he was going to do; that he had earned the property. In a conversation with William L. Joy, his legal adviser for thirty-six years, he stated that Milo had assisted him faithfully in caring for the children, and that he did not know how he could have gotten along without him after the death of his wife, and that he had given him one hundred and sixty acres of prairie land and some timber land. At other times he told him Milo was entitled to it, and that he deserved what he had done for him. To John M. Pinckey he said that he had promised Milo this place of two hundred and more acres; that soon after his mother's death he had agreed with Milo, if he would stay there on the place and do as he had done, he would give him this place and give him teams and machinery to run it, and build him a house. He also told Pinckey he had earned the land and fulfilled the part of his contract, and should have it. The testimony of Moses Smith is to the same effect. This evidence is strongly corroborated by the fact that Mills did everything he had promised except convey the land. He constructed the buildings, gave the team and cattle, and put Milo in possession five years before his death. It will not do in the light of this record, to quibble over the use of words. "Give" was not employed as indicating the disposition of a gratuity, but for the consideration of services rendered by a dutiful son. Neither the deceased nor Milo spoke of the arrangement as a contract or sale, but of what each was to do or had done. That he had promised his dying mother to help care for her children only strengthens the probabilities in his favor, as the deceased would be the more likely to promise to convey the land to induce him to stay in accordance with her wish. It is said Milo did not intend to claim the land under the contract, but to file claim against the

executor for compensation for the eight years he worked for the deceased. Undoubtedly he did not understand what course he must pursue, but in the conversation concerning recovery nothing was said indicating the farm had not been promised in payment. In every instance where it is claimed the plaintiff said he had no contract, it appears reference was had to a written instrument. Mrs. McCaustland testifies that when she was looking over Mills' property, with a view of marrying him, he directed Milo to show her the plantation, and that the latter pointed out this land as belonging to the deceased. The plaintiff denies having done so, and in this he is corroborated by Frank, who is not sure about the matter. While the circumstance is not controlling, we are inclined to think she is mistaken. The boys were more familiar with the premises and would be more likely to remember the route taken. Declarations of Mills that he would deed none of his land during his lifetime are proven by the appellee, but these are explained by other statements to the effect that he could not convey the land to Milo because his wife declined to sign the deed. While Mrs. McCaustland says she never refused to do so, there is no doubt that the deceased so believed, and that this was his only reason for not doing all he had promised.

The only doubtful question in the case is not argued. It seems to be conceded by the parties in argument and in the evidence that the land in controversy is that to which reference is had. It was apart from the other land of the deceased, and he spoke of it as Milo's farm. Tracy and Frank P. Mills point it out quite definitely in their testimony. The construction of the house thereon and the possession taken leaves little doubt of what was intended. But the case was tried on the theory that there was no dispute as to the description, and, as the point is not raised here, we need only remark

that, without indicating the metes and bounds or the government subdivisions, the arrangement seems to have contemplated that involved in this action. We have no doubt the contract was made as alleged.

II  The appellant complied with the contract as understood by the parties. What they meant by speaking of the children when grown up or able to look after themselves is difficult to determine. At the time the arrangement was made the youngest child was only four years old, and about eleven when Milo left home. They were then well able to care for themselves in the home provided for them. The deceased had treated the contract as fulfilled, and repeatedly declared Milo had earned the farm and was entitled to it, and that he was only prevented from conveying it to him by the refusal of his wife to join in the deed. The construction given this contract by the parties is binding, and it is sufficient that they were contented with the performance of its conditions.

III.  There is some evidence to the effect that appellant elected to take under the will. In this case he may claim this land under the contract, although devised to him, and such other property as may be left him under the terms of that instrument. If this land did not belong to deceased, he could not dispose of it, and, because of this, appellant ought not to be prevented from claiming such as he in fact owned and left to him. There is no inconsistency in such a course. It is only where some inconsistency is involved that an election is necessary. *Hainer v. Legion of Honor*, 78 Iowa, 245; 1 Jarman, Wills, 443; 1 Pomeroy, Equity Jurisdiction, 461; Bigelow, Estoppel, 562. We conclude that a decree should be entered granting the plaintiff the relief prayed.—REVERSED.